## SUPREME JUDICIAL COURT

#### FOR THE COUNTY OF

# KENNEBEC.

### SEPTEMBER TERM,

### 1822.

THE PEJEPSCOT PROPRIETORS *v.* CUSHMAN.

Construction of the Indian deed of the "*Pejepscot claim,*" and its boundary on the east side of the great falls at *Lewiston.*

THIS was a writ of entry on the seisin of the demandants within thirty years, to which the general issue was pleaded.

The demanded premises are situated on the east side of *Androscoggin* river, above the great falls at *Lewiston.* At the trial of the issue, it was admitted that the demandants held the title of *Richard Wharton* and others, under a deed from *Warrumbee* and others, Indian chiefs, bearing date *July* 9, 1684, and purporting to convey—" all the aforesaid lands from the " *uppermost part of Androscoggin falls* four miles westward, and " so down to *Maquoit,* and by said river of *Pejepscot,* and from " the other side of *Androscoggin* falls, all the land from the falls " to *Pejepscot* and *Merrymeeting* bay to *Kennebec,* and towards " the wilderness, *to be bounded by a south-west and north-east line,* " to extend from the *upper part* of the said *Androscoggin upper-* " *most falls* to the said river of *Kennebec,* and all the lands from " *Maquoit to Pejepscot,*" &c.—Also—" all the land lying five " miles above *the uppermost* of the said *Androscoggin* falls, in " breadth and length holding the same breadth from *Androscog-* " *gin* falls to *Kennebec* river, and to be bounded by *the aforesaid* " *south-west and north-east line,* and a parcel of land at five miles

" distance to run from *Androscoggin* to *Kennebec* river as afore-
" said," &c.

The falls referred to lie in a bend of the river, which contains
several islands; and the commencement of the fall, or broken
water, on the west side, is many rods higher up the river than
any similar appearances on the east side;—so that running a
northeast course from the commencement of the fall on the *west*
*side* of the river, would include the demanded premises within
the tract described in the deed; while commencing at the be-
ginning of the fall on the *east bank* would as clearly exclude
them.

The demandants read a resolve passed *June* 21, 1803, au-
thorizing the committee for the sale of eastern lands to appoint
a surveyor to ascertain and run the lines of the *Pejepscot* claim,
agreeably to the report of *Levi Lincoln, Samuel Dexter* and
*Thomas Dwight*, Esquires, so far as the lands of the Common-
wealth adjoin the same;—and they also shewed the appoint-
ment of *Lothrop Lewis*, Esq. as surveyor, under this resolve,
and his return dated *September* 1805, certifying that he began at a
red oak tree on the *west* bank of the river, at the uppermost
part of the falls on *that side*, and ran a line north-west five miles,
and *from the end of said five miles* north-east to *Androscoggin*
river, and continuing across the river the same course to the
line of the *Plymouth* claim;—also from the same red oak tree,
west, about four miles to the curve-line, and marked a beech
tree for the head-line of the Pejepscot claim on the west side of
*Androscoggin* river.

The tenant in support of his title read a resolve passed
*March* 26, 1788, adding *John Read* and *Daniel Cony*, Esquires
to the committee on unappropriated lands in the counties of
*Cumberland* and *Lincoln*, extending their powers to the county
of *York*, and directing them to cause a survey and plans to be
made of the located lands in those counties, and to mark out
the unlocated lands into townships, &c.—also a survey and
return of *Ephraim Ballard*, dated *October* 31, 1794;—also
a deed from *Nathaniel Wells, Leonard Jarvis* and *John Read*,
Esquires, in behalf of the Commonwealth, to *David Cobb*, Es-
quire, dated *January* 20, 1795, conveying to him the demanded
premises in fee;—and a deed conveying the same land from
said *Cobb* to the tenant in fee, bearing date *January* 21, 1815.

Pejepscot Proprietors *v.* Cushman.

To shew that the persons who undertook to convey to said *Cobb* had no power so to do, and that the functions of the committee were suspended, the demandants relied on the resolve of *March* 8, 1787, directing the committee on unappropriated lands not to locate or dispose of any lands lying upon *Androscoggin* river, and between said river and lands claimed by the *Plymouth* company, to the southward of the south line of *Bakerstown*, bounded at the great fall in *Androscoggin* river, on the west and south line of Port-Royal, on the east side of the river.

In reply to this the tenant relied on the resolve passed *March* 26, 1788 above cited, in which the committee or the major part of them were instructed generally to sell the unappropriated lands in any of said counties ;—and also read a resolve of *June* 20, 1788 directing the same committee to sell all the lands in either of said counties which had become the property of the Commonwealth by confiscation. He also proved by the Hon. *Daniel Cony*, one of the committee, that *Nathan Dane*, *John Brooks*, and *Rufus Putnam*, who had been appointed members of the committee for the sale of eastern lands, by previous Resolves, had never acted on that committee after *March* 1788, and that he understood they had resigned.

It was contended by the counsel for the demandants that the line run by Col. *Lewis* in 1805 as the northern boundary of the upper tract conveyed by *Warrumbee* and others, was final and conclusive; and as by that line the premises demanded were within the limits of the *Pejepscot* claim, the tenant was bound by it. But the Judge who presided at the trial instructed the jury that as Col. *Lewis* was only appointed to run and establish the line of the *Pejepscot* claim so far as the lands of the Commonwealth adjoined the same, and as it appeared that the adjoining tract on this side had been conveyed to Mr. *Cobb* several years before the survey, he and those claiming under him were not bound by the running of that line, unless it was established in the proper place. He further instructed them that *Messrs. Wells, Jarvis* and *Read* were sufficiently authorized to convey the premises by deed, according to the resolves of *March* 26, and *June* 20, 1788, and the testimony offered ; and that as *Warrumbee* and others by their deed conveyed one tract of land on the *west side* of the river by a certain boundary and head line run-

Pejepscot Proprietors *v.* Cushman.

ning from the uppermost part of the falls; and another tract on the *east side* of the river, running another and different, viz. a northeast course from the uppermost part of the falls on the *east bank* of the river as the boundary of the tract on *that side;* and that measuring from *this point,* according to the plan taken in this case and exhibited to the jury, these principles would lead to a verdict for the tenant.

A verdict was accordingly taken for the tenant, subject to the opinion of the Court upon the foregoing facts as stated in the report of the Judge.

*Longfellow, Greenleaf* and *Fessenden* were of counsel for the demandants.—*Orr* and *R. Williams* for the tenant.

*For the demandants* it was argued—1. That the lands on both sides of the *Androscoggin* formed one entire tract, and had a common boundary—viz.—the uppermost part of the uppermost falls; and was described by *one line,* and this a continued line, extending across the river.—2. That this boundary was fixed and established by Col. *Lewis* under the resolve of *June* 21, 1803, and that this survey concluded the Commonwealth and all persons claiming under them. *Lunt v. Holland,* 14 *Mass.* 149.—3. That if this survey was not final and conclusive as to the land on the *east side* of the river, and the land was to be considered as two tracts, divided by the river, then they were bounded by the thread or channel of the river, and the admeasurement is to begin at the point where the water first breaks at the centre of the stream, agreeably to *Lunt v. Holland.*—4. That the deed from *Wells* and others to *Cobb* was without authority. The resolve of *March* 26, 1788, relates to *unappropriated* lands;—but these were already *appropriated* by the resolve of *March* 8, 1787, to the use of the Commonwealth, with special reference to the unsettled state of the title. This resolve is a sufficient *caveat* to any purchaser, who must be considered as taking the land subject to the prior claim of the demandants. And it is not repealed by the resolve of *March* 26, 1788, there being no express words of repeal, nor any *necessary* implication. *Pease v. Whitney,* 5 *Mass.* 580.—5. Nor was the same deed to *Cobb* made by a *majority of the committee* for the sale of eastern lands. By the resolve last cited, two

were added to the committee, increasing the number to seven,—— *four* of whom constituted the *majority* mentioned in the re- solve ;—a majority of the committee *then existing ;*—not of such number as might chance to remain after the resignation or death of the rest.  But if not, yet the evidence of the resigna- tion of some of the committee was not legal, being only *parol ;* nor was it sufficient, being only what the witness understood from others.

*For the tenant,* it was contended that the land described in the Indian deed consisted of two distinct tracts, each having for its northern limit the upper part of the water-fall at the bank of the river it adjoined ;—that the survey of Col. *Lewis,* so far as it respected the east side of the river, was without authority, his commission extending no farther than where the Common- wealth's land adjoined, which applied only to the west side ;— that the appropriation of lands by the resolve of *March* 8, 1787, was only a temporary suspension of the powers of the commit- tee, and was repealed by that of *March* 26, 1788, which is a revision of the whole subject matter ;—and they referred to various resolves shewing that the persons acting as the commit- tee were duly authorized; especially to that of *March* 10, 1791, in which *Messrs. Phillips, Wells, Jarvis, Read* and *Cony* are styled " *the committee* for the sale of eastern lands."

After the argument, which was had at the last term, the cause was continued for advisement; and the opinion of the Court was now delivered as follows, by

WESTON J.   In the argument of this cause, it has been urged on the part of the counsel for the demandants, that the lands on the east side, and the lands on the west side of the *Andro- scoggin* conveyed by *Warrumbee* and others, by their deed of *Ju- ly ninth,* 1684, constituted one entire tract, through which the river flowed ; and that the monument ascertained and fixed on the western side, or at least a point in the thread of the river, at the uppermost part of the falls, would form the common starting place, from which the head line of the land on the west side of the river, running a west course, and the head line of that lying on the east side, running a northeast course, would be ascertained.

Pejepscot Proprietors *v.* Cushman.

The lands on each side would constructively run to the channel or thread of the river; and being conveyed by the same deed to the same grantees, would form one entire tract, if the grantees thought proper thus to regard them. But as the land conveyed, as it presented itself to the eye, was in fact separated by the intervention of the river, it was natural and obvious to consider it as forming two prominent divisions. And with a view to this division, or for some other reason, the lands on the west, and those on the east side of the river, are conveyed with a reference to that natural boundary. But in the view we have taken of the cause, we have not considered the determination of this point decisive of the controversy, raised on this occasion.

Two principal questions present themselves for our consideration  First, is the monument, as ascertained and fixed by *Lothrop Lewis,* conclusive between these parties ?  Secondly, if it be not so, were the jury properly instructed as to the principles by which they were to ascertain and fix the uppermost part of the falls, referred to in the deed of *Warrumbee* and others, from which to run a northeast course ?

The determination of the first question involves another, namely, the validity and effect of the deed of *January twentieth,* 1795, from *Nathaniel Wells, Leonard Jarvis,* and *John Reed,* assuming to act as a committee in behalf of the Commonwealth of *Massachusetts* to *David Cobb,* under whom the tenant claims. The objections urged against this last deed are twofold; that it is not the deed of a majority of the committee, and that if it be so, they were not authorized to sell the premises in question.

By a resolve of *November eleventh,* 1784, *Samuel Phillips, Jr. Nathaniel Wells,* and *Nathan Dane,* were appointed a committee in relation to unappropriated lands in the county of Lincoln ; and the powers of the committee were subsequently enlarged, so as to extend to all the counties in Maine. In *November,* 1785, *John Brooks* was, by a legislative resolve, substituted in the place of *Nathan Dane,* then absent at Congress. By a resolve of *March twenty-fourth,* 1786, *Samuel Phillips, Jr. Nathaniel Wells,* and *John Brooks* are described as the committee on the subject of unappropriated lands. On the *sixteenth* of *November,* 1786, *Leonard Jarvis* and *Rufus Putnam* were, by a resolve of

that date, added to the committee ; any two of whom by con-
sent of the majority were empowered to transact and complete
any business, that might be assigned to the committee.  By a
legislative resolve of *November seventeenth,* 1786, the accounts of
*Nathan Dane,* who is described as having been one of the com-
mittee on the subject of unappropriated lands were, upon his
memorial, referred to the same committee for examination and
allowance.  And by the resolve of *November fourteenth,* 1788,
the balance found due by that committee to Mr. *Dane,* was di-
rected to be paid.  In the resolve of *March tenth,* 1791, *Samuel
Phillips, Nathaniel Wells, Leonard Jarvis, John Reed,* and *Daniel
Cony* are described as the committee for the sale of eastern
lands.  This last resolve fully corroborates the testimony of
*Daniel Cony,* one of that committee, which forms a part of this
case, that prior to that time, *Nathan Dane, John Brooks,* and
*Rufus Putnam* had ceased to be members of the committee.
And upon a full consideration of the foregoing resolves, and of
the testimony of the said *Cony,* we are satisfied that at the time
of the making of the before mentioned deed to *David Cobb,
Nanthaniel Wells, Leonard Jarvis,* and *John Reed,* who united in
the execution of that deed, did constitute a majority of the com-
mittee for the sale of eastern lands.

As to the objection that the committee were directed not to
sell a certain tract of land, embracing the premises in question,
for certain reasons recited in the resolve of the legislature of
*March eighth,* 1787, we are of opinion that this inhibition was
completely removed by the resolve of *March twenty-sixth,* 1788,
by which the committee, or a majority of them, were authorized
to sell the unappropriated lands in any of the counties, " any
resolve to the contrary notwithstanding."

It results therefore, that by the deed of a majority of the
committee of the *twentieth* of *January,* 1795, to *David Cobb,* all
the right, title, and interest of the Commonwealth of *Massachu-
setts* to the premises in question, passed to the said *Cobb,* under
whom the tenant claims.

After thus parting with their interest, it is not to be presumed
that the Commonwealth would do any thing to affect or impair
that interest, in the hands of their grantee.  If in fact there
were no constitutional objection to their so doing, nothing short

Pejepscot Proprietors *v.* Cushman.

of language the most express and unequivocal, indicating such an intention, could be deemed or construed to have that effect. So far is the resolve, under which *Lothrop Lewis* was appointed, from justifying such an implication, that the agents of the Commonwealth for the sale of eastern lands, are there authorized and directed to appoint some suitable person, to run and ascertain the line of the *Pejepscot* claim only " so far as the lands of the Commonwealth adjoin thereto."   -

And we are of opinion that neither the resolve of *June twenty-first*, 1803, under which *Lothrop Lewis* was appointed, nor what he did in virtue of that appointment was intended to have, or could legally have, the effect to impair the title or interest, which had passed to *David Cobb* in *January*, 1795, and which has since vested in the tenant.   As to the tenant this proceeding was *res inter alios acta.*   He was neither party or privy to, or legally connected with, or concluded by it.

It remains to determine whether the jury were properly instructed as to the principles by which they were to ascertain and fix the uppermost part of the falls, from which a northeast line was to be run, referred to in the deed under which the demandants claim.

When fixing the uppermost part of these falls, as the monument from which the tract on the eastern side of the river was to begin, we cannot doubt that the parties had reference to that monument as it existed and was to be found, on the same side of the river.   And even if we consider the lands on both sides of the river as forming one entire tract, we are not aware that a different result would be produced.   The line from the river on the west side was to run a west course, and on the east side, a northeast course.   No course is given across the river.   And we know of no more obvious or satisfactory construction that can be given to the language of the deed, or one which seems better calculated to effectuate the intention of the parties than to take the uppermost part of the falls, as it is to be found on the western side of the river, as the starting point from which the west course is to be run; and the uppermost part of the falls, as it is to be found on the eastern side of the river, as the point from which the northeast course is to be run. Thus the uppermost part of the falls, as they lie from side to

side, whether they pass directly or obliquely, will be the course across the river.

Being all of us fully satisfied with the opinion and direction given upon the trial of this cause, judgment is to be entered upon the verdict,